IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

AMY FORD,
Plaintiff,

v.

BECTON, DICKENSON AND COMPANY,
Defendant.

Case No. 20–CV–01315–JPG

**<u>MEMORANDUM & ORDER</u>**

This is an employment discrimination case. Before the Court is Defendant Becton, Dickenson and Company's ("Becton's") Partial Motion to Dismiss. (ECF No. 17). Plaintiff Amy Ford responded, (ECF No. 25); and Becton replied, (ECF No. 26); For the reasons below, the Court **GRANTS** Becton's Motion and **DISMISSES** Counts I and II of the Complaint **WITHOUT PREJUDICE**.

I. **PROCEDURAL & FACTUAL HISTORY**

According to the Complaint, Ford began working as a sales consultant in 2006. (Compl. at 3). St. Louis, Missouri was her territory; and she did her job well. (*Id.*).

In 2015, Becton merged or acquired the company that Ford was working for; and she retained her position. (*Id.*).

That year, Ford informed Becton that she suffers from "an undermined autoimmune disorder and/or immune deficiency" that substantially limits her ability to perform major life activities. (*Id.*). She also informed Becton that her son, too, suffers from a serious medical condition that limits his ability to perform major life activities. (*Id.*).

In October 2018, Becton reassigned Ford's sales territory. (*Id.* at 4). Rather than nearby St. Louis, Ford would instead have to drive about three hours to her largest customers. (*Id.* at 4). Ford told her supervisor that her and her son's medical conditions make long-distance travel difficult, so she requested reassignment back to St. Louis. (*Id.*). Her supervisor refused and accused her of being "negative" about the territory change—even though Becton has allowed other, non-disabled employees to change territories so they could work closer to home. (*Id.*).

Later that month, Ford returned to her supervisor and again requested accommodation because of her and her son's medical conditions. (*Id.*). Her supervisor "stated that it may be time for Ford to look for another job." (*Id.*). He again refused to change her territory but said that she could work fewer days during the week if she still hit her sales quota. (*Id.*). He also said that she could miss meetings if she had to travel because another employee could cover for her. (*Id.* at 5). Even so, Ford's supervisor said that she would still have to apply for leave under the Family Medical Leave Act ("FMLA") if she had to miss a meeting. (*Id.*).

After this discussion, Ford complained to human resources by submitting "an official accommodation request form." (*Id.* at 5). The request was denied because Becton only offers accommodations "for people with physical disabilities in wheelchairs." (*Id.*). Ford then told human resources that she was being harassed and treated "differently because of her and her son's health conditions." (*Id.*). Nothing changed. (*Id.*).

In December 2018, Becton sent "Ford a 'letter of concern' that criticized and scrutinized Ford's performance in an unfair manner that was not directed at other employees." (*Id.*). Again, Ford complained to human resources that she was being discriminated against because of her and her son's health conditions; and it again fell on deaf ears. (*Id.*).

Over the next year, Ford had to seek intermittent leave under the FMLA at least twice. The first time was in January 2019 because of her own health conditions, and the second was "[i]n approximately Spring/Summer 2019" because of her son's. (*Id.* at 6). A month after the first request, however, Ford received "negative feedback in a coaching and Development Plan . . . ." (*Id.*). And "[i]n or about Summer 2019," Ford was denied an opening for a sales-consultant position in St. Louis, which she interviewed for. (*Id.*).

Then, in October 2019, Becton "placed Ford on a performance improvement plan" that "included one or more false claims or allegations." (*Id.*). For example, the plan stated that Ford failed to hit one of her quotes when she actually "far exceeded" it. (*Id.*). Indeed, she "was ranked 40 out of 104 Sales Consultants in the company . . . ." (*Id.*).

On December 5, 2019, Ford filed a Charge of Discrimination with the Missouri Commission on Human Rights. (ECF No. 1-4). It recounted all the facts above. (*Id.*).

In February 2020, Becton "accused Ford of violating company policy by forwarding certain email to herself," even though "other Sales Consultants forwarded similar emails to themselves." (Compl. at 6). Ford offered to delete the emails, but Becton fired her instead. (*Id.*).

Finally, on April 6, 2020, Ford filed a Charge of Discrimination with the Illinois Department of Human Rights. (ECF No. 1-5). It also recounted all the facts above, including Ford's termination. (*Id.*).

Now, Ford is suing Becton for disability discrimination here. Counts I and II of her Complaint allege that Becton violated the Americans with Disabilities Act ("ADA") and the Illinois Human Rights Act ("IHRA"), respectively. (Compl. at 7–11). More specifically, Ford says that Becton subjected her to both disparate treatment and a hostile work environment. (*Id.*).

Further, Count III alleges that Becton violated the FMLA by retaliating against her for requesting intermittent leave. (*Id.* at 11–12).

Becton, in turn, moved to dismiss Counts I and II. It contends that Ford (1) failed to state a claim for disparate treatment or hostile work environment, and (2) failed to timely exhaust her administrative remedies.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes defendants to seek dismissal for failure to state a claim. To survive a motion to dismiss, the factual allegations in the complaint must plausibly suggest "a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All well-pleaded allegations must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Twombly*, 550 U.S. at 555.

## III.  LAW & ANALYSIS

The ADA provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *See* 42 U.S.C. § 12101(b)(1). It prohibits qualifying employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a). Examples include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A); "denying employment opportunities to . . . an otherwise qualified individual with a disability, if

such denial is based on the need of [the employer] to make reasonable accommodation," *id.* § 12112(b)(5)(B); and "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association," *id.* § 12112(b)(4). Similarly, "[w]hen analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims." *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 14 (Ill. App. Ct. 1989); *Teruggi v. CIT Grp./Cap. Fin., Inc.*, 708 F.3d 654, 659 (7th Cir. 2013) (analyzing IHRA claim just as ADA claim).

Title 42, Section 2000e-5 of the U.S. Code is among the ADA's enforcement provisions. *See* 42 U.S.C. § 12117(a). It "'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).

> An individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made. In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits.

*Id.* at 109. This limitations period, "while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Del. State Coll. v. Ricks*, 449 U.S. 250, 256–57 (1980) It "inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463–64 (1975). Thus, because both Missouri and Illinois have agencies authorized to grant relief from unlawful

employment practices, *see* 29 C.F.R. § 1601.80, "[a] charge filed beyond the 300-day period is untimely and barred," *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 536 (7th Cir. 2013).

For a disparate-treatment claim, the limitations period begins when a discrete act of discrimination occurs. *See Morgan*, 536 U.S. at 114. " 'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of" a protected characteristic. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 n.15 (1977). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Morgan*, 536 U.S. at 114. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' " *Id.* It follows that "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (1979). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted" the antidiscrimination laws. *See Int'l Bhd. of Teamsters*, 431 U.S. at 365 n.15.

For a hostile-work-environment claim, on the other hand, the limitations period "includes every act composing the claim, whether those acts are independently actionable or not." *See Green v. Brennan*, 136 S. Ct. 1769 1778 (2016) (citing *Morgan*, 536 U.S. at 115–21).

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

*Morgan*, 536 U.S. at 115. Put differently, a hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Id.* at 116 (cleaned up). Determining whether a hostile work environment exists requires examining the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (cleaned up). Because a hostile-work-environment claim involves "a series of separate acts that collectively constitute one unlawful employment practice," only a single "act contributing to the claim" must occur within the limitations period. *Id.* at 117. "[F]or the purposes of determining liability," however, a court can consider "the entire time period of the hostile environment," including acts that occurred outside the limitations period. *Id.*

Ford points to *Gates v. Board of Education of the City of Chicago*, 916 F.3d 631 (7th Cir. 2019), to support her hostile-work-environment claim; but that case is inapt. In *Gates*, a supervisor directed "racially toxic language" against an employee. *See id.* at 637. "Three incidents are key: (1) the 2013 'joke' in which Rivera called Gates the N-word; (2) the 2013 meeting in which Rivera threatened to write up Gates's 'black ass'; and (2) the 2014 'you people' comment in which Rivera again addressed Gates using the N-word." *Id.* at 637. The district court found that "this level of harassment from a supervisor was not severe or pervasive enough to render an employee's work environment hostile." *Id.* But the Seventh Circuit reversed because the district court undermined the severity of the supervisor's behavior: "In short, when the harassment involves such appalling racist language in comments made directly to employees by the supervisors, we have not affirmed summary judgment for employers." *Id.* at 639. Ford latches on to language in *Gates* about how the

workplace need not be "hellish" for it to be actionable. *See id.* at 637. Even so, the allegations Ford's Complaint are not nearly "as severe and direct" as the discrimination in *Gates*. *See id.* at 641. Ford does not allege that Becton ever made an unambiguous epithet about her disability—while the supervisor's behavior *Gates* fell " 'on the more severe end of the spectrum' " because such explicitly racist and humiliating rhetoric tends to have a " 'a highly disturbing impact on the listener.' " *Id.* at 640 (quoting *Hrobowski v. Worthington Steel Co.*, 538 F.3d 473, 477 (7th Cir. 2004)).

Ford's analogy with *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826 (7th Cir. 2015), similarly fails. There, a Muslim plaintiff alleged that her employer subjected her to "screaming, [Christian] prayer circles, social shunning, implicit criticism of non-Christians," denial of religious time off, exclusion from social gatherings, and arbitrary workplace rules not imposed on other employees, among other things. *See id*. at 830, 833. The Seventh Circuit found that these allegations were severe and persuasive enough to state a hostile-work-environment claim. *Id.* at 833. But none of the allegations in Ford's Complaint come close to the level of abuse depicted in *Gates* or *Huri*. Indeed, neither her supervisor nor human resources said anything outright disparaging. At worst, the allegations constitute offensive utterances. Nor does Ford allege that the discrimination was so pervasive as to impact her work performance—she was the 40th-best sales consultant in the company. Taken as a whole and accepted as true, the conduct alleged in the Complaint was not so severe or pervasive as to alter the terms and conditions of Ford's employment. So to the extent that they allege hostile-work-environment claims, Counts I and II are **DISMISSED**.

Next, the Court considers whether Ford's claims, considered as discrete acts, were brought within the limitations period. Ford filed charges of discrimination with the Missouri Commission on Human Rights and the Illinois Human Rights Commission on December 5, 2019, and April 6, 2020, respectively. For the allegations in those charges to be timely, they had to have occurred within 300 days of those dates—after February 8, 2019, or June 11, 2019. Fatally, the bulk of Ford's accusations came before then: Her reassignment and conversation with her supervisor occurred in October 2018, as did her initial correspondence with human resources; and the letter of concern and second correspondence with human resources occurred in December 2018. In brief, these acts occurred outside the limitations period and are not actionable. So to the extent that they allege disparate-treatment claims arising from conduct before February 8, 2019, Counts I and II are **DISMISSED**.

IV.   **CONCLUSION**

The Court **GRANTS** Defendant Beckton, Dickenson and Company's Partial Motion to Dismiss and **DISMISSES** Counts I and II of the Complaint **WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

**Dated: Friday, April 30, 2021**

<u>S/J. Phil Gilbert</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**